Lee **LOUDERBACK**, Paula **Kastler**, and Angela **Thurston**, Plaintiffs,

v.

**ORKIN EXTERMINATING COMPANY, INC.**, Defendant.

No. 97–1370–WEB.

United States District Court, D. Kansas.

Oct. 14, 1998.

Randall K. Rathbun, Depew and Gillen, L.L.C., Wichita, KS, for Lee R. Louderback, Paula D. Kastler, Angela S. Thurston.

Eldon L. Boisseau, J. Darin Hayes, Turner & Boisseau, Chartered, Wichita, KS, Stephan V. Beyer, Sarah R. Lyke, Sidley & Austin, Chicago, IL, for Orkin Exterminating Co. Inc.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter came before the court on the defendants' motions to exclude the testimony of plaintiffs' experts and for summary judgment on all of plaintiffs' claims. The court heard oral argument on October 13, 1998, and ruled orally on the motions at that time. This written memorandum will supplement the court's oral ruling.

The plaintiffs are current or former employees of the United Methodist Church of Harper, Kansas. They allege that in July of 1995, employees of defendant Orkin were treating the church for termites when they negligently drilled through and injected termiticide into the heating and air conditioning duct work of the church. Approximately one year passed before this alleged contamination was discovered. The plaintiffs contend that they suffered physical and mental harm from exposure to chlorpyrifos, the active ingredient in the termiticide used by Orkin.

1. *Defendant's Motion to Exclude Plaintiffs' Experts.* Plaintiffs intend to offer the opinion testimony of two experts to show causation of their alleged injuries. One is Dr. Daniel Goldstein, a medical doctor board-certified in toxicology. The other is Dr. Dennis Helffenstein, a Ph.D. neuropsychologist. They will offer opinions that the plaintiffs suffered physical and psychological injuries caused by exposure to chlorpyrifos at the church. Defendant contends these experts are not qualified to express an opinion on the toxicology of chlorpyrifos and that their testimony does not meet the standard for admissibility of scientific testimony of *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

a. *Qualifications.* In summary, the expert qualifications cited by the plaintiffs are as follows. Dr. Daniel Goldstein, M.D., is currently an Associate Medical Director–Product Coordinator for the Monsanto Company. Prior to this position, he practiced medicine for ten years in Denver, Colorado, with a scope of practice including Clinical Toxicology, Occupational and Environmental Toxicology, Acute and Chronic Poisoning and Clinical Pharmacology. He is board certified by the American Board of Medical Toxicology, the American Board of Pediatrics, the American Board of Clinical Pharmacology, and the Royal College of Physicians and Surgeons of Canada (Pediatrics). He is also board certified in medical toxicology under the current examinations conjointly offered by the American Board of Pediatrics, American Board of Emergency Medicine and the American Board of Preventive Medicine. In his clinical practice, he has diagnosed and treated hundreds of patients who have been exposed to toxic substances. Approximately one-third of his practice in the last ten years was in the area of forensic toxicology. He asserts that he is aware of the literature surrounding chlorpyrifos and organophosphates (the class of compounds to which chlorpyrifos belongs), including medical literature dealing with organophosphate insecticides and their effect on the central nervous system. He has previous teaching experience in the area of organophosphates and their toxicological action and neuropathy as part of a course for the Colorado School of Mines. He has rewritten a large number of organophosphate documents for "Micromedics," which is a primary reference of the vast majority of poison control centers.

Dr. Dennis Helffenstein is a Ph.D. who has practiced in neuropsychology for the past seventeen years. He has examined or treated over 300 patients who have been exposed

to toxic substances. He has examined or treated 12–15 patients (including the plaintiffs) who have been exposed to organophosphate pesticides, 6 to 8 of whom (including the plaintiffs) have been exposed to chlorpyrifos. The majority of these cases have been individuals referred for treatment by their physicians. He states that he is aware of the literature dealing with neuropsychological injuries caused by exposure to organophosphate pesticides and has reviewed the literature on an individual basis to see how his patients fit the patterns discussed in the literature. He has done postgraduate work at toxicologic seminars that have included components on organophosphate pesticides.

The court has little trouble concluding that Dr. Goldstein has sufficient knowledge, education and experience to qualify as expert in the field of toxicology. The defendant appears to concede as much but argues that Dr. Goldstein does not have sufficient expertise with chlorpyrifos. The court rejects this argument as an overly constrictive view of the requirements of Rule 702. *See Kannankeril v. Terminix Intern., Inc.,* 128 F.3d 802, 809 (3rd Cir.1997) ("We reject [defendant's] suggestion that [the doctor] must be an expert in Dursban to provide expert testimony on the causation of [plaintiff's] injury.").

■ As for Dr. Helffenstein, the court concludes that he has sufficient expertise in neuropsychology to express opinions falling within that specialty. This would include his opinion that the plaintiffs are suffering from cognitive and other deficits and his opinion as to the extent and duration of those problems. The court cannot find, however, that Dr. Helffenstein has sufficient expertise in the area of toxicology to offer an opinion that the cognitive and other deficits he found were caused by exposure to chlorpyrifos. The plaintiffs have not shown that Dr. Helffenstein has sufficient training or experience to be thoroughly familiar with the methods of toxicology. He does not have an advanced degree in toxicology, pharmacology or epidemiology, and he is not certified as a specialist in these areas. He has done no original research with respect to organophosphates and his deposition testimony indicates a lack

of familiarity with significant and relevant scientific literature on this topic. In sum, the court finds that the defendant's motion to exclude Dr. Helffenstein's opinion testimony as to causation should be granted.

■ The court notes the plaintiffs' argument that the testimony of these two experts should be admitted under the "training and experience" exception to *Daubert* recognized by the Tenth Circuit. *See Compton v. Subaru,* 82 F.3d 1513 (10th Cir.1996). The court rejects this argument.[1] The court concludes that this exception does not apply to the facts of this case. As stated by the Eleventh Circuit, *Daubert* applies to the testimony of experts who rely on the application of scientific principles. *Carmichael,* 131 F.3d at 1435. The determination of whether a chemical agent caused a particular disease is clearly a matter of scientific inquiry. Moreover, the deposition testimony of the plaintiffs' experts shows that they purported to rely on scientific methods in forming their opinions. *Cf. Michigan Millers Mut. Ins. Corp. v. Benfield,* 140 F.3d 915, 919 (11th Cir.1998). Plaintiffs cite no case applying the training and experience exception to an issue of chemical causation, and the court concludes that it would not apply in such a case.

b. *Daubert.*

■ Rule 702 of the Federal Rules of Evidence provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Under *Daubert,* when faced with a proffer of expert scientific testimony, a district court "must determine at the outset, pursuant to [Fed. R.Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. When district courts employ this standard, they ensure that the proffered evidence is not only

---

1. As the defendant points out, the propriety of this exception is before the Supreme Court. *See Carmichael v. Samyang Tire, Inc.,* 131 F.3d 1433 (11th Cir.1997), *cert. granted by Kumho Tire Co. v. Carmichael,* —— U.S. ——, 118 S.Ct. 2339, 141 L.Ed.2d 711 (June 22, 1998).

relevant, but reliable. *See id.* at 589, 113 S.Ct. 2786. Reliability is verified by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592–93, 113 S.Ct. 2786. Several nondispositive factors should be considered in determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. *See id.,* 509 U.S. at 593–94, 113 S.Ct. 2786. In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786. The second part of the inquiry—relevance—is determined by ascertaining whether the reasoning or methodology properly can be applied to the facts in issue. *Id.* at 593, 113 S.Ct. 2786. In other words, the court must determine whether the testimony is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Summers v. Mo. Pac. Railroad System,* 132 F.3d 599, 603 n. 5 (10th Cir.1997).

### c. *Application of Daubert.*

Defendant contends—and plaintiffs do not contest the point—that the scientifically valid and accepted method of determining whether a chemical agent such as chlorpyrifos is capable of causing a particular adverse effect is defined by the discipline of toxicology. *See Summers v. Mo. Pac. Railroad System,* 132 F.3d 599, 603 (10th Cir.1997). Orkin argues that Dr. Goldstein[2] failed to follow accepted methods of toxicology in reaching his conclusions. Defendant's primary argument, as the court understands it, is that Dr. Goldstein did not consider the actual exposure or dose of chlorpyrifos to which the plaintiffs were subjected or whether such a dose has been demonstrated to cause the type and extent of harm allegedly suffered by the plaintiffs. This alleged failure is crucial, defendant argues, because air monitoring data taken at the church 13 months after the application showed that the amount of chlorpyrifos in the air was well within levels considered safe

under standards established through toxicological studies. In response, plaintiffs argue that Orkin's arguments go the weight and not the admissibility of their expert's opinion. They assert that "an expert, relying on his experience and knowledge of causation factors, may express an opinion which draws a rational conclusion as to causation." *Stover v. Eagle Products, Inc.,* 896 F.Supp. 1085, 1090 (D.Kan.1995).

With this background in mind, the court will summarize Dr. Goldstein's opinion and methods, as disclosed by his affidavits and deposition testimony. Doc. 68, Exhs. 1 and 3; Doc. 75, Goldstein Aff. Dr. Goldstein's affidavit states that chlorpyrifos has a well described acute toxicity, and that the clinical effects of organophosphate insecticides include blurred vision, increased upper and lower respiratory secretions, bronchospasm, abdominal cramping, and diarrhea. He further states that organophosphate insecticides are known to induce a peripheral neuropathy as a result of the inhibition of neurotoxic esterase. He asserts that chlorpyrifos also has irritant properties which will allow it to aggravate sinusitis, rhinitis, and other respiratory conditions such as asthma. Dr. Goldstein states his opinion that all three plaintiffs suffered acute manifestations of organophosphate poisoning from their exposure to chlorpyrifos at the church. He concluded that one or more of the following symptoms were present in one or more of the plaintiffs and were caused by the exposure: upper and lower respiratory symptoms, gastrointestinal symptoms, peripheral neuropathy, and neuropsychological injury. Dr. Goldstein noted that each of the plaintiffs had a pre-existing history of one or more of these symptoms, but he concluded that exposure to chlorpyrifos likely aggravated the pre-existing condition.

Dr. Goldstein states that in forming his opinion he performed a routine medical examination on each of the plaintiffs, which included a medical history and physical examination. He reviewed the plaintiffs' medical records and records of the Kansas

---

2. In view of the court's finding that Dr. Helffenstein does not possess the qualifications to render an opinion that plaintiffs' injuries were caused by

chlorpyrifos, the court will discuss *Daubert* only as it applies to Dr. Goldstein's testimony.

Department of Agriculture and Terracon Environmental Consulting relating to the termiticide application at the church. He asserts there was nothing unusual about his method of reaching a diagnosis and states that he "carefully considered symptoms and attempted to rule out other possible causes for the symptoms and conditions experienced by these plaintiffs." He notes that Orkin argues that the plaintiffs reported symptoms inconsistent with chlorpyrifos exposure but states that based on his experience "I would be surprised if during the year following exposure the plaintiffs would not demonstrate some inconsistency of symptoms" and "any number of things could account for an inconsistent symptom." He states that this would not affect his diagnosis. He further notes that an Orkin expert has attempted to calculate the exposure the plaintiffs received by use of air monitoring data taken 13 months after the application at the church. He states:

It is irresponsible to attempt an accurate calculation of the dose received by the plaintiffs from this data. No one can state with precision the levels the plaintiffs were exposed to in the first year at the Church. However, certain facts are known. The levels of chlorpyrifos in the air at the Church would have dropped exponentially with time. The exposures the plaintiffs sustained would have been much larger at the beginning and would have fall[en] off at the end. Exposure shortly after the misapplication would most likely have been vastly greater than the levels 13 months later.

Doc. 75, Goldstein Aff., Sept. 22, 1998, at 3.

According to the Federal Judicial Center's *Reference Manual on Scientific Evidence* (1994), one of the central tenets of toxicology is that "the dose makes the poison." "This implies that all chemical agents are harmful—it is only a question of dose. Even water, if consumed in large quantities, can be harmful." *Id.* at p. 185. Because of this, an important component of toxicological research is "dose-response relationship," which is a determination of the extent of an observed effect at various doses. *Id.* at 188. This in turn permits a determination of an-

other important characteristic—the "no observable effect level" (or "threshold level"), which is the level above which no observable effects in test animals are believed to have occurred and below which no toxicity is observed. *Id.* at 188–89. The FJC's Reference Manual states that three preliminary assessments should be made by a toxicologist as the premise for an opinion on causation:

First, the toxicologist should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. Second, the expert should examine if the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. Finally, the expert should offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient to cause the disease.

*Id.* at 201. With respect to a conclusion that a known or alleged exposure to a chemical was in fact the cause of a person's disease, the Reference Manual states:

An expert who opines that exposure to a compound caused a person's disease engages in deductive clinical reasoning. *** The opinion is based on an assessment of the individual's exposure, including the amount, the temporal relationship between the exposure and the disease, and exposure to other disease-causing factors. This information is then compared to research data on the relationship between exposure and disease. The certainty of the expert's opinion depends on the strength of the research data demonstrating a relationship between exposure at the dose in question and the absence of other disease-causing factors (also known as confounding factors).

*Id.* at 205.

Dr. Goldstein's deposition testimony indicated that he is generally aware that a threshold limit value for exposure to chlorpyrifos has been established by the American Conference of Governmental Industrial Hygienists and that the Environment Protection Agency has promulgated a "reference dose" (maximal safe intake dose) for chlorpyrifos. He was unaware of these specific levels, however, and did not take them into account in forming his opinion.[3] Dr. Goldstein's deposi-

---

3. Although he was unaware of the specific EPA reference dose for chlorpyrifos, Dr. Goldstein

indicated in his deposition that based on the

tion testimony indicates that in forming his opinion he relied primarily upon the temporal association between the plaintiffs' exposure and their claimed symptoms, the fact that there were three individuals with a common exposure and common symptoms, the literature documenting the effects of certain exposures to organophosphates, and the lack of other explanations for the plaintiffs' symptoms.

Upon cross-examination, Dr. Goldstein conceded that the classic symptoms of acute organophosphate overexposure include excessive salivation, excessive lacrimation (tearing), excessive urination, and diarrhea, and that none of the plaintiffs complained of any of these symptoms in the year after the application. He conceded that one or more of the plaintiffs had complained of dry mouth and constipation, which are inconsistent with the classic symptoms of acute organophosphate overexposure. Dr. Goldstein conceded that he was unaware of any scientific or medical literature associating exposure to chlorpyrifos at the levels recorded at the church with any of the respiratory or neurological symptoms reported by the plaintiffs, or of any literature associating cognitive complaints of the type asserted by the plaintiffs in the absence of the symptoms of acute overexposure.

■ Given this background, the court must decide whether a failure by a toxicological expert to take into account standards such as the ACGIH threshold level and the EPA reference dose in rendering an opinion on causation renders the opinion unreliable under *Daubert*. The FJC Reference Manual and several reported cases suggest that it might. The FJC Reference Manual states that "[e]ven if an individual was exposed to a chemical, if the level of exposure was below the no observable effect or threshold level, a relationship between the exposure and disease cannot be established." *Id.* at 208. In *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105 (8th Cir.1996), the court of appeals reversed a judgment in favor of a group of plaintiffs who claimed to have been injured by exposure to wood fibers containing for-

maldehyde that were emitted from a nearby factory. The court said that in order to recover in a toxic tort case, the plaintiff must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the toxic substance. *Id.* at 1106 (citing cases). Although the plaintiffs had evidence that formaldehyde could cause symptoms of the type they had, and also proved that they were exposed to formaldehyde from the factory (it was in their sputum and urine), the court nevertheless found they had failed to produce evidence of exposure to a hazardous level of the chemical. *Id.* at 1107. The court noted that although one of plaintiffs' experts testified that the symptoms were more probably than not related to the exposure, his opinion "was not based on any knowledge about what amounts of wood fibers impregnated with formaldehyde involve an appreciable risk of harm to human beings" and his opinion therefore should have been excluded under *Daubert*. *Id.* at 1108. In another case, the Fifth Circuit (*en banc*) found an expert's opinion to be unreliable at least in part because the expert had no accurate information on the level of the plaintiff's exposure to toluene fumes. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir.1998). A number of other cases have employed similar reasoning in excluding expert testimony or in finding that the plaintiff had not met the burden of proof. *See e.g., Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 199 (5th Cir.1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."); *Mancuso v. Con. Edison Co. of New York*, 967 F.Supp. 1437 (S.D.N.Y.1997) (expert's methodology of determining causation without a dose-response analysis was unreliable under *Daubert* because it ignored "the most fundamental tenet of toxicology—toxins cause illnesses only at sufficient dosages"); *Maddy v. Vulcan Materials Co.*, 737 F.Supp. 1528, 1533 (D.Kan.1990) ("In cases claiming

plaintiffs' medical effects he believed their intake of chlorpyrifos exceeded the reference dose. To conclude merely from the presence of the plaintiffs' non-specific symptoms that their exposure

exceeded the threshold level, however, appears to be at odds with accepted methods of toxicology.

personal injury from exposure to toxic substances, it is essential that the plaintiff demonstrate that she was, in fact, exposed to harmful levels of such substances.").

A case applying the same standard but finding the expert's opinion to be sufficiently reliable was *Bednar v. Bassett Furn. Manuf. Co.*, 147 F.3d 737 (8th Cir.1998). *Bednar* involved exposure to formaldehyde emitted from a dresser. In that case, the level of formaldehyde to which the plaintiff (an infant) was exposed could not be determined precisely, but an expert testified that a test performed on the dresser before trial showed the presence of formaldehyde gasses in the dresser drawers in excess of safe levels. He also testified that the emission rate from the dresser would have decreased rapidly over time and that formaldehyde gas would have concentrated in the air in the room where the infant slept. *Id.* at 740. In light of this testimony, the court concluded the evidence was sufficient for a jury to infer that the plaintiff's exposure exceeded safe levels. *Id.*

One case suggesting that evidence of the level of exposure is not essential is *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802 (3rd Cir.1997). In *Kannankeril*, like the instant case, the plaintiffs alleged that they suffered cognitive impairments from exposure to chlorpyrifos. The plaintiffs' expert based his opinion of causation largely on the temporal relationship between the exposure and the symptoms, the nature of the symptoms, and a "differential diagnosis" attempting to rule out other causes. *Id.* at 807–09. Although an ambient air test performed nine months after the last application indicated non-detectable levels of pesticides, the court of appeals said that this fact was not determinative. *Id.* at 809. It rejected the district court's finding that the expert had no knowledge of the plaintiffs' degree of exposure, saying the expert "had sufficient knowledge of exposure" from his review of application records showing when, where, and how much pesticide was applied. *Id.* at 808. The court noted that "the toxic effects of organophosphates on humans are well recognized by the scientific community" and concluded that the expert's opinion had a factual basis and supporting scientific theory. *Id.* at 809.

*Kannankeril* is the most factually similar decision to the instant case, and the court adopts the reasoning expressed by that court. Whether Dr. Goldstein might have done a better job is not the issue. *Cf. Kannankeril*, 128 F.3d at 809. Dr. Goldstein's qualifications suggest that he is thoroughly familiar with toxicological methodology. His affidavit and deposition testimony show that he considered the facts of the plaintiffs' exposure, the temporal relationship between exposure and the disease, the scientific literature establishing an association between chlorpyrifos exposure and various symptoms, the plaintiffs' medical records and history of disease, and exposure to or the presence of other disease causing factors. All of these factors, according to the FJC's Reference Manual, are appropriate criteria in forming an opinion on causation. As *Kannankeril* noted, the toxic effects of organophosphates on humans is not a novel theory but has been recognized by the scientific community in peer-reviewed published articles. *Id.* at 809. Dr. Goldstein's opinion on causation clearly "has a factual basis and supporting scientific theory." *Id.*

The court cannot conclude that Dr. Goldstein's failure to consider the threshold levels of exposure necessarily makes his opinion on causation unreliable. Although the FJC's Reference Manual makes clear that the level of exposure is a significant factor, it does not say that it is essential or that an opinion cannot be based on other relevant criteria when the level of exposure cannot be determined. The court also notes that the FJC Reference Manual identifies seven factors to be considered in making a judgment about causation in the related field of epidemiology, and indicates that the absence of dose-response relationship does not weaken an inference of causation. *Id.* at 163. Along this same line, the expert report submitted by the defendant's toxicologist, Dr. Robert C. James, Ph.D., identifies five criteria that he considers to be essential to an opinion of specific causation, including a finding that the dose was of sufficient magnitude and duration to be capable of causing the alleged effect. Although Dr. James offers his opinion that a failure to satisfy any of these five criteria is "usually fatal" to a causation opinion, he does not cite any authority for that proposition, nor does he identify the excep-

tions implied by the term "usually."[4] The court cannot conclude that Dr. Goldstein's method was inconsistent with accepted methods of toxicology.

In addition to the question of dose and exposure, the defendants also argue that Dr. Goldstein's opinion is not reliable for other reasons, such as his alleged failure to explain inconsistent symptoms in the plaintiffs, failure to adequately address their medical history, and failure to adequately address confounding factors. Dr. Goldstein's affidavits and testimony shows that he considered these matters in forming his opinion, and the court concludes that these matters do not make the opinion inadmissible under *Daubert*. Rather, they go to the credibility of the opinion and are matters to be addressed by the defendant through cross-examination of Dr. Goldstein. In sum, the court concludes that Dr. Goldstein's testimony is based on scientific knowledge and will aid the jury in determining the issues at trial. The defendant's motion under *Daubert* to exclude Dr. Goldstein's testimony will be denied and the jury will be given the opportunity to determine whether this testimony is credible.

■ 2. *Defendants' Motion for Summary Judgment on the Issue of Medical Causation.* In this motion Orkin argues that if the court excludes the testimony of plaintiffs' experts then Orkin is entitled to summary judgment on the issue of medical causation. Because the court has concluded that the opinion testimony of Dr. Goldstein as to causation is admissible, the motion for summary judgment as to causation will be denied. Dr. Goldstein's opinion is sufficient to create a genuine issue of fact as to whether the plaintiffs' alleged injuries were caused by their exposure to chlorpyrifos.

■ 3. *Defendant's Motion for Summary Judgment on Plaintiffs' Negligence Claim.* The plaintiffs allege that the defendant negligently applied the termiticide at the church and thereby caused injuries to the plaintiffs. Defendant argues it is entitled to summary judgment on this claim because the plaintiffs have failed to designate an expert to testify concerning the standard of care in the pest control industry or to give an opinion that Orkin failed to meet that standard of care.

The uncontroverted facts for purposes of this motion are set forth in defendant's memorandum in support (Pp. 2–3) and in plaintiffs' response (Pp. 2–10) and are incorporated herein by reference. Based on the uncontroverted facts, the court concludes that the motion for summary judgment should be denied.

Negligence is the lack of ordinary care under the circumstances. The court will only briefly recite some of the evidence that tends to show Orkin failed to exercise reasonable care in connection with the application of termiticide. The plaintiffs have evidence that Orkin knew prior to taking this particular job that treatment of sub-slab duct work was difficult and potentially dangerous, yet it had no training program to show technicians how to do such work. There is evidence that the duct work of the church was punctured numerous times by Orkin when its teen-age temporary workers drilled holes through it and that chlorpyrifos was injected into the duct work. Plaintiffs cite the affidavit of a state Department of Agriculture investigator who says that he has never seen as many holes drilled in ducts between lines as he saw in the church and that in his opinion any reasonable person should have realized the ducts were possibly being punctured. The label on the termiticide in question stated: "Precaution: do not apply dilution until location of heat or air conditioning ducts, vents ... are known and identified. Extreme caution must be taken to avoid contamination of these structural elements and airways." Robert Henthorn, a branch manager for Orkin, admitted that Orkin "made some mistakes" on the job, namely the "ones that the state wrote us up on was for getting chemical in the duct work." Without belaboring the point, the court finds the plaintiffs have cited sufficient evidence from which a jury could reasonably conclude that Orkin was negligent, regardless of whether or not plaintiffs have a designated expert on the standard of

---

4. By contrast, Dr. James identifies the "Hill criteria" as the accepted method in the scientific and medical community for establishing general causation, Doc. 68, Exh. 8 at 13–16, and he recognizes that no single criteria is essential for reaching an opinion on general causation.

care for pest control operators. The facts above, including the warning label on the termiticide, are sufficient standing alone to provide evidence of the standard of care from which a jury could find negligence. *Cf. Dewing v. Orkin Exterminating Co.*, 897 F.Supp. 44 (N.D.N.Y.1995). This is not a case involving professional standards of conduct beyond the understanding of a lay person. *See Moore v. Associated Material and Supply*, 263 Kan. 226, 948 P.2d 652 (1997) (Where the normal experience and qualifications of jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are not necessary). Accordingly, defendant's motion for summary judgment on the negligence claim is denied.

■ 4. *Defendant's Motion for Summary Judgment on Plaintiffs' Fraud Claim.* Defendant moves for summary judgment on plaintiffs' claim of fraud. The uncontroverted material facts for purposes of this motion are set forth in defendant's memorandum (Pp. 2–7) and plaintiffs' response (Pp. 2–11) and are incorporated herein by reference. Orkin argued in its memorandum that the fraud claim fails because plaintiffs' deposition testimony shows they did not believe the allegedly false representations of Orkin employees. As such, defendant argued, plaintiffs have not proven the essential element of reliance. *See Bank IV v. Aetna*, 810 F.Supp. 1196, 1207 (D.Kan.1992) (elements of fraud include justifiable reliance upon the misrepresentation). In response, the plaintiffs assert that the defendant "is focusing on the wrong false statements," and they set forth other allegedly fraudulent statements made by Orkin employees.

Orkin correctly points out that the plaintiffs' response attempts to rely upon statements that were not pled with specificity in the complaint (as required by Rule 9(b)) and were not claimed in the pretrial order as a basis for fraud. Under the circumstances, the court agrees with Orkin that plaintiffs are precluded at this point from shifting the basis of their fraud claim. The court further concludes that the defendant is entitled to summary judgment because plaintiffs have failed to cite evidence of justifiable reliance with respect to the misrepresentations alleged in the complaint. *See Slaymaker v.*

*Westgate State Bank*, 241 Kan. 525, 739 P.2d 444 (1987) (the victim of fraud must have believed the misrepresentations to be true and acted upon them).

5. *Defendant's Motion for Summary Judgment on Plaintiffs' Claim for Abnormally Dangerous Activity, Breach of Fiduciary Duty, Public Nuisance, and Punitive Damages.*

■ a. *Abnormally Dangerous Activity (Strict Liability).* Defendant seeks summary judgment on this claim by arguing that the application of termiticide at plaintiffs' place of employment as a matter of law does not constitute an abnormally dangerous activity under Kansas law. Defendant notes that this court has previously ruled that the spraying of herbicides does not qualify as abnormally dangerous, *Desaire v. Solomon Valley Co–op*, 1995 WL 580064, *13, 1995 U.S.Dist. LEXIS 14523, *13 (D.Kan., Sept. 14, 1995), and it cites rulings from other jurisdictions finding that application of pesticides likewise does not qualify. *See e.g., Villari v. Terminix Int'l, Inc.*, 663 F.Supp. 727, 732 (E.D.Pa.1987). Plaintiffs argue that the sub-slab treatment undertaken in this case is abnormally dangerous, as shown by Orkin's own documents calling the process "at best, a hazardous operation." They assert that many companies refuse to undertake such work because it is too dangerous. Plaintiffs also cite *H. Wayne Palmer & Assoc. v. Heldor Indus., Inc.*, 839 F.Supp. 770 (D.Kan.1993), where this court held that the storage of hazardous chemicals was abnormally dangerous.

■ In determining whether an activity is abnormally dangerous, Kansas law requires a consideration of the following factors: (a) the existence of a high degree of risk of some harm to the person, land or chattels of others; (b) the likelihood that the harm that results from it will be great; (c) the inability to eliminate the risk by the exercise of reasonable care; (d) the extent to which the activity is not a matter of common usage; (e) the inappropriateness of the activity to the place where it is carried on; and (f) the extent to which its value to the community is outweighed by its dangerous attributes.

*See Williams v. Amoco Production Co.,* 241 Kan. 102, 115, 734 P.2d 1113 (1987).

After considering these factors in light of the uncontroverted facts, the court concludes as a matter of law that the activity in this case does not qualify as abnormally dangerous. First, the court notes there is no evidence that the risk of harm from this type of treatment cannot be eliminated through the exercise of reasonable care. *Cf. Greene v. Product Mfg. Corp.,* 842 F.Supp. 1321 (D.Kan.1993) (no abnormal danger from the use of cancer-causing solvents if used with proper care). Second, this type of activity is entirely appropriate in terms of the place where it was performed. Third, there is nothing to show that the benefit from pesticide treatment such as this is outweighed by the danger. And finally, although there is a risk of some harm to persons from this type of treatment, particularly if not done properly, the resulting harm does not appear likely to be life-threatening. Most activities considered abnormally dangerous carry a serious risk of life-threatening harm that cannot be eliminated through the exercise of reasonable care. In sum, the court finds that the activity was not abnormally dangerous and the motion for summary judgment will be granted as to this claim.

■ b. *Breach of Fiduciary Duty.* Defendant argues it is entitled to summary judgment on plaintiffs' claim for breach of fiduciary duty because there is no evidence that Orkin voluntarily and consciously accepted the duties of a fiduciary, which is a mandatory element of such a claim. *See Rajala v. Allied Corp.,* 919 F.2d 610, 615 (10th Cir.1990). In response, plaintiffs argue that *Ensminger v. Terminix,* 102 F.3d 1571 (10th Cir.1996) demonstrates that Orkin had a fiduciary duty.

■ The court finds the defendant is not entitled to summary judgment on this claim. A fiduciary duty arises where a special confidence has been placed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one placing the confidence. *See Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235 (1982). Whether or not such a duty arises depends on the facts and circumstances of each case. In this case,

such a duty could be said to exist from the relationship between the parties. According to plaintiffs' evidence, Orkin held itself out to be an expert in treating this type of building for termites and plaintiffs relied upon that expertise. In such circumstances, equitable considerations could require Orkin to fully inform the plaintiffs with respect to such matters upon which it had superior knowledge, such as the proper handling of chemicals spilled in the building and whether there were any latent problems with the treatment. Moreover, a reasonable jury could conclude that Orkin voluntarily assumed such a duty from its contractual relationship and course of dealing with the plaintiffs. Under the circumstances, the court will have to hear all of the evidence before it can determine whether a fiduciary relationship existed between the plaintiffs and the defendants. As such, the motion for summary judgment is denied.

■ c. *Public Nuisance.* Plaintiffs allege that Orkin's conduct caused the church to be closed for approximately sixteen months, and they contend that this interference constituted a public nuisance because the church would otherwise have been used by many community groups.

■ Generally speaking, a nuisance is something that unreasonably interferes with the rights of another and thereby causes harm. A claim of public nuisance is based on infringement of the rights of the state or community at large, as opposed to the rights of an individual. *Culwell v. Abbott Constr., Inc.,* 211 Kan. 359, 506 P.2d 1191, 1195 (1973).

The court concludes the defendants are entitled to summary judgment on this claim. As an initial matter, no evidence has been presented to show that Orkin's acts created a danger to public safety. Nor has evidence been cited to show an infringement on the rights of the public. In this regard, the court concludes that interference with the permissive use of the church by local groups is not an infringement upon public rights. *See Second Restatement of Torts,* § 821B, comment g ("Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a

large number of persons. There must be some interference with a public right."). Accordingly, summary judgment is granted in favor of Orkin.

 d. *Punitive Damages.* Finally, defendant argues it is entitled to summary judgment on the claim for punitive damages because there is no evidence that its conduct was willful or wanton.

The court concludes that a genuine issue of fact exists as to whether or not Orkin's conduct was wanton. An act may be considered wanton if it is performed with a realization of the imminence of danger and a reckless disregard to the probable consequences of the act. *Friesen v. Chicago, R. I. & P. R.R.*, 215 Kan. 316, 322–23, 524 P.2d 1141, 1147–48 (1974). There is evidence in the record from which a reasonable jury could find wanton conduct. For example, Orkin's use of teenage temporary workers for a job it knew was particularly difficult, its alleged conduct in telling one of the plaintiffs that it was her job to clean up chemicals spilled by Orkin, and Orkin's telling the plaintiffs that everything was fine when the plaintiffs complained or questioned Orkin's handling of the pesticide treatment and the chemical smell in the church. Viewing this and the other evidence in the light most favorable to the plaintiffs, the court concludes a reasonable jury could find that Orkin was aware of the imminence of danger and recklessly disregarded the consequences of its actions.

*Conclusion.*

Defendant Orkin's Motion to Exclude Testimony of Plaintiffs' Experts (Doc. 68) is GRANTED IN PART AND DENIED IN PART;

Defendant's Motion for Summary Judgment on the Issue of Medical Causation (Doc. 66) is DENIED;

Defendant's Motion for Summary Judgment on Plaintiff's Negligence Claim (Doc. 60) is DENIED;

Defendant's Motion for Summary Judgment on Plaintiffs' Fraud Claim (Doc. 62) is GRANTED;

Defendant's Motion for Summary Judgment (Doc. 64) is GRANTED with respect to plaintiffs' claims for abnormally dangerous

activity and public nuisance and is DENIED as to the claims for breach of fiduciary duty and punitive damages.