# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-4098

_____

| | |
|---|---|
| Richard Bednar, Jr.; Laura Bednar, Individually and as Next Friends of Marian Kristen Bednar, | * <br> * <br> *   Appeal from the United States <br> *   District Court for the |
| Plaintiffs-Appellants, | *   Eastern District of Arkansas. <br> * |
| v. | * <br> * |
| Bassett Furniture Manufacturing Company, Inc., | * <br> * |
| Defendant-Appellee. | |

_____

Submitted: April 16, 1998
Filed: June 24, 1998

_____

Before BOWMAN, Chief Judge,[1] McMILLIAN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Richard and Laura Bednar brought this action against Bassett Furniture Manufacturing, Inc., (Bassett) based on diversity of citizenship, 28 U.S.C. § 1332, alleging that a dresser it had manufactured emitted dangerous levels of formaldehyde

_____

[1]The Honorable Pasco M. Bowman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 18, 1998.

which injured their baby, Marian Kristen. They appeal from a summary judgment in favor of Bassett. We reverse and remand.

The Bednars purchased the Bassett dresser from Montgomery Ward prior to the birth of Marian for the room they were preparing for the expected baby. They installed the dresser in the room and put various baby clothes, linens, and blankets in it. Several family members noticed the dresser had what they described as a "new" smell. Marian was born on September 26, 1994 with no health problems and was taken to her room at home a few days later. The noticeable odor was still coming from the dresser, and by this time it had permeated the clothes and linens stored in it.

Marian soon began to suffer from unusually rapid breathing and redness in her eyes. Despite repeated visits to the doctor, the problems persisted and the Bednars began to suspect that they were related to the dresser. In late November Marian's breathing problems worsened and caused her parents to take her to the hospital and to contact poison control. They removed the dresser from Marian's room when they returned from the hospital, and her respiratory difficulty and eye inflammation began to subside. She was nevertheless hospitalized again on December 1, and she continued to suffer chronic kidney infections that did not respond to normal antibiotic treatments and she developed reactive asthma and gastrointestinal reflux. The Bednars noticed that Marian seemed irritable and hyperactive, grew quite slowly, and developed several allergies that required almost daily shots to control.

The Bednars filed suit against Bassett and Montgomery Ward, raising claims of negligence, strict product liability, and breach of the implied warranties of merchantability and fitness for a particular purpose under the Uniform Commercial Code. The district court administratively terminated the action against Montgomery Ward after an automatic bankruptcy stay went into effect, and subsequently Bassett moved for summary judgment after there had been substantial discovery.

The Bednars provided a variety of evidence to support their claims. Dr. Thomas Rimmer, an industrial hygienist, tested the dresser for formaldehyde emission. He testified at his deposition about the test findings, as well as the levels of formaldehyde exposure that have been found to cause various health problems. Guidelines developed by government and industry for formaldehyde exposure and its effects relied on by Dr. Rimmer were also put in the record. Evidence about the emission of formaldehyde from Bassett products was produced from its employee Wayne Atkins, its retained expert, Dr. Henry Simmons, and its internal testing reports. The baby's treating physicians, Dr. Christian Lindsey and Dr. Alfred Johnson, gave their diagnosis that she suffered from the effects of acute formaldehyde exposure, and several family members described her symptoms and the chemical odors coming from the dresser.

The district court granted summary judgment on the basis that the Bednars had not made a sufficient showing that the dresser's emission of formaldehyde proximately caused Marian's physical problems, citing Wright v. Willamette Industries, Inc., 91 F.3d 1105 (8th Cir. 1996). Summary judgment is reviewed de novo, Unigroup v. O'Rourke Storage & Transfer, 980 F.2d 1217, 1219 (8th Cir. 1992), and is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The key question here is whether the evidence, viewed in the light most favorable to the Bednars, could support a finding of causation in their favor. Matsushita Electrical Industrial Co., v. Zenith Radio, 475 U.S. 574, 587 (1986).

Wright was also a toxic tort case involving Arkansas law. The plaintiffs there had prevailed at trial but lost on appeal because they had not made a submissible case of causation. In Wright the court explained that a plaintiff in such a case must establish both "the levels of exposure that are hazardous to human beings generally" and "the plaintiff's actual level of exposure to the defendant's toxic substance." 91 F.3d at 1106. The plaintiffs in Wright failed to meet either requirement. Although their theory of recovery rested on the effects of formaldehyde in wood fibers, they produced no

evidence about what level of exposure to such fibers would be harmful or about what amount of  formaldehyde was in the wood fibers present in their house.  Id at 1107. Their experts testified about the level of gaseous formaldehyde that would have adverse effects, but they did "not claim to have been injured from breathing gaseous formaldehyde."  Id.  They could not recover because they had not shown that they had been exposed to a hazardous level of formaldehyde from the fibers.

The Bednars' theory of recovery was based on hazardous levels of gaseous formaldehyde emanating from the dresser manufactured by Bassett, and they supplied substantial evidence to meet both Wright requirements.  They produced evidence that the threshold limit of safe exposure to gaseous formaldehyde approved by the American Conference of Governmental Industrial Hygienists is 0.3 parts per million (PPM), that the average safety limit set by the National Institute for Occupational Safety & Health for an eight hour period is 0.016 PPM and 0.1 PPM for any individual fifteen minute exposure, and that the safety limit recognized by the Occupational Safety and Health Administration is 0.75 PPM for an eight hour average and 0.2 PPM for any fifteen minute period.  Dr. Rimmer testified that irritation of the eyes and respiratory system could be triggered by exposure over 0.1 PPM, that diminished lung capacity and asthma could follow prolonged exposure to amounts over 0.24 PPM, and that the risk of cancer would increase from exposure ranging from 0.10 to 0.07 PPM.  Dr. Simmons, Bassett's own expert, testified that exposure to formaldehyde at a level of 0.10 PPM or more could cause adverse health effects, and Bassett's safety documents indicated that acute exposure could trigger irritation of the eyes, respiratory system, and digestive tract.

In this case there was testing of the formaldehyde source, and the Bednars produced evidence that Marian was actually exposed to dangerous levels of gaseous formaldehyde.  Before conducting his tests Dr. Rimmer removed the covering that had been placed on the dresser while it was in storage and then left the dresser in the open for two days.  The test results indicated that the air in the dresser drawers contained

gaseous formaldehyde at a level of 0.35 PPM.  Dr. Rimmer testified as to the levels of formaldehyde that are considered unsafe and that the dresser was emitting gaseous formaldehyde, that formaldehyde collects and concentrates in the air over time, and that the gaseous formaldehyde in the drawers exceeded accepted safe limits.  His testimony was based on his tests and recognized health standards and scientific literature.  See Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 709 (1993).  Although Bassett argues that the formaldehyde in the dresser would have concentrated after it was covered for storage, the dresser was left in open air for two days before testing.  Dr. Rimmer testified that the formaldehyde emission rate from a new product would decrease rapidly over time which made it impossible to recreate the exact conditions in Marian's room after the fact, but he also testified that the formaldehyde gas would have concentrated in the air in the room and that the concentration of formaldehyde gas in the dresser drawers exceeded recommended exposure levels.  The evidence put in the record provided a sufficient basis from which a trier of fact could infer that the baby's exposure to gaseous formaldehyde exceeded safe levels.

Additional evidence of Marion's exposure was present from other sources. Bassett employee Atkins testified that the dresser was constructed of medium density fiberboard which has the highest formaldehyde emission rate of any pressed wood product and that company tests of the batch of fiberboard used in the dresser showed it had an unusually high formaldehyde emission rate.  Both Dr. Simmons and Dr. Rimmer testified that clothes and linens stored in the dresser would absorb formaldehyde, and the concentration of formaldehyde gas in the drawers exceeded safe levels according to Dr. Rimmer's tests.  Dr. Lindsey's reaction upon examining baby clothes from the dresser at the time he was treating Marion was, "[d]amn, that's a chemical odor."  Marian's grandmother reported that her eyes burned after she used a towel stored in the dresser, and her aunt testified that she noticed a chemical odor whenever she was in the baby's room and that the clothes and other items stored in the dresser smelled of it.  Dr. Johnson testified that the baby had elevated levels of antibodies in her blood indicating recent exposure to formaldehyde.  He diagnosed her

illness as caused by "toxic effects of formaldehyde exposure." Bassett's expert, Dr. Simmons, also admitted that Marian's elevated level of antibodies and symptoms of respiratory distress and redness around the eyes were consistent with formaldehyde exposure.

Based on this evidence, a jury could infer that it was more likely than not that baby Marian's illnesses were caused by exposure to unsafe levels of formaldehyde emanating from the dresser. The Bednars did not need to produce "a mathematically precise table equating levels of exposure with levels of harm" in order to show Marian's level of exposure to gaseous formaldehyde, but only "evidence from which a reasonable person could conclude that [the] defendant's emission has probably caused" the harm about which they complain. Wright, 91 F.3d at 1107. The Bednars had to make a threshold showing that the dresser exposed the baby to levels of gaseous formaldehyde known to cause the type of injuries she suffered. This they did.

Since the Bednars produced a submissible case on causation, summary judgment should not have been granted. Whether they can prevail on the merits remains to be seen, and Bassett may well persuade the trier of fact of its position. In the meantime, however, the summary judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.