**Troy MATTIS and Patricia Mattis, Plaintiffs,**

v.

**CARLON ELECTRICAL PRODUCTS, Lamson and Sessions, and Oatey Company, Defendants.**

**No. Civ 98–4091.**

United States District Court,
D. South Dakota,
Southern Division.

Sept. 29, 2000.

Charles Rick Johnson, Johnson, Eklund, Nicholson, Peterson & Fox, Gregory, SD, Bruce V. Anderson, Wagner, SD, for plaintiff.

James E. Moore, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Defendants, Carlon Electrical Products, Lamson & Sessions, and Oatey Company, have filed a Motion to Exclude the Testimony of two experts who have been retained by Plaintiffs Troy and Patricia Mattis. Defendants have also filed a Motion for Summary Judgment which is wholly contingent on their Motion to Exclude Testimony. For the reasons stated below, the Motion to Exclude Testimony and the Motion for Summary Judgment are both denied.

## BACKGROUND

This case involves Carlon All Weather Quick–Set Clear Cement (Carlon Cement), a product which is produced by Defendants,[1] and used to bind together sections of polyvinyl chloride (PVC) pipe. Carlon Cement contains PVC resin, amorphous silica, and four hazardous solvents: (1) acetone, (2) cyclohexanone, (3) methyl ethyl ketone, and (4) tetrahydrofuran. Carlon Cement works when it is applied to the end of one section of PVC conduit and the conduit is forced into a PVC fitting. As the solvents in Carlon Cement evaporate, the conduit and fitting are fused into a watertight seal.

On July 11–13 of 1995, Plaintiff Troy Mattis used Carlon Cement to install electrical conduit at a construction site near Wagner, South Dakota. The conduit which Mattis installed was composed of ten-foot sections of PVC pipe, which were laid outdoors. After the sections had been laid in trenches 24 inches deep and 18 to 36 inches wide, Mattis personally fused some of the conduit by pulling sections of pipe out of the trench, and applying Carlon Cement with a dauber attached to the lid of the Carlon Cement can. Mattis reports that he sometimes heard a hissing noise when unscrewed the lid of the can. Once he had applied Carlon Cement to a joint, Mattis screwed the lid back down, dropped the conduit into the trench, and moved on to the next section. The weather on the three days was sunny, hot and calm. Mattis testified that there was "not much" wind on the 11th and 13th. The high temperature on the 11th of July was 98 degrees Fahrenheit; on the 12th and 13th it was around 110 degrees.

On July 14, after he was done working at the construction site,[2] Mattis began to experience nausea and headaches. On Sunday, July 16, Mattis visited the hospital complaining of a headache. By Sunday evening, he was beginning to suffer shortness of breath. His condition worsened on Monday and, on Tuesday July 18, Mattis went to the hospital again. This time he stayed at the hospital until July 23, when he was discharged. Although the hospital records report a "significant improvement" in his pulmonary status, Mattis was still having trouble breathing when he came home from the hospital.

On August 18, 1995, Mattis was evaluated by Dr. Lori Hansen, a pulmonologist at the Yankton Medical Clinic in Yankton, South Dakota. Dr. Hansen has since been retained as an expert witness by Plaintiffs. During her initial evaluation of Mattis, Dr. Hansen noted that he was 25 years old and did not have a history of breathing problems or a personal history of smoking. Dr. Hansen also gave Mattis a methacholine challenge, a test which is used to determine whether a patient suffers from reactive airways or asthma. Based on the positive result of this test, Mattis's exposure to Carlon Cement fumes, and the absence of respiratory disease in Mattis's medical history, Dr. Hansen diagnosed

---

1. Carlon Cement is manufactured by defendant Oatey Company, which makes the product for defendant Lamson & Sessions. Defendant Carlon Electrical Products is a business unit within Lamson & Sessions.

2. Troy Mattis also used the Carlon Cement one time on July 14, to secure PVC conduit to an electrical panel inside a house in Wagner.

Mattis with dyspnea, or shortness of breath. Dr. Hansen later linked Mattis's difficulty breathing to Reactive Airways Dysfunction Syndrome (RADS). Dr. Hansen says that, during her career, she has treated a total of six cases involving RADS.

RADS was first named and described in an academic article published in 1985. *See* Stuart M. Brooks, Mark A. Weiss & I.L. Bernstein, *Reactive Airways Dysfunction Syndrome: Persistent Asthma Syndrome after High Level Irritant Exposures*, 88 Chest 376 (September 1985) (the Brooks article). The Brooks article's description of RADS is based on the examination of 500 asthma patients at the University of Cincinnati Medical Center between 1975 and 1982, ten of whom were actually identified as suffering from the syndrome. *Id.* at 376. The examinations of these patients resulted in eight criteria for the diagnosis of RADS:

1. A documented absence of respiratory complaints.

2. The onset of symptoms occurred after a single specific exposure or accident.

3. The exposure was to a gas, smoke, fume or vapor which was present in a very high concentration and had irritant qualities to its nature.

4. The onset of symptoms occurred within 24 hours after the exposure and persisted for at least three months.

5. Symptoms simulated asthma with cough, wheezing and dyspnea predominating.

6. Pulmonary function tests may show airflow obstruction.

7. Methacholine challenge testing was positive.

8. Other types of pulmonary diseases were ruled out.

*Id.* at 377, Table 1. None of the agents listed as causes of RADS in the Brooks article are present in Carlon Cement. *Id.* at 377, Table 2.

The Brooks article does not take a position on how a gas, fume or vapor actually causes RADS. Although the article reports the agents were present in "very high concentrations" in the patients who were examined, it also states that in each case the "exact concentrations of the incriminating agent were not available, since the incident where the exposure occurred was unusual and unexpected." *Id.* at 378. The article does note that "[t]he incriminated etiologic agents all shared a common toxicologic characteristic of being irritant in nature," and suggests that "[m]echanisms to explain the development of RADS must focus on the toxic effects of the irritant exposure on the airways." *Id.* at 380. The authors admit, however, that "[t]his conclusion is only speculative and not substantiated." *Id.* Thus, while the Brooks article advances several hypotheses for how the identified agents might cause RADS, it leaves open the question whether RADS differs from "typical adult onset intrinsic asthma," a condition that differs from RADS in that it is not caused by a documented etiologic factor. *Id.* at 382.

Plaintiffs have also retained Roger Wabeke, an industrial hygienist, to testify that the specific fumes in Carlon Cement caused Troy Mattis to suffer from RADS. According to Mr. Wabeke's Affidavit, which was filed in response to Defendants' motions, RADS is produced by excessive exposure to air contaminants that have low molecular weights and a recognized history as being respiratory irritants. Mr. Wabeke's Affidavit states that the four organic solvents in Carlon Cement—acetone, cyclohexanone, methyl ethyl ketone and tetrahydrofuran—all fit this definition.[3] These solvents, the Affidavit continues,

---

3. Several days prior to the hearing on Defendants' motions, Plaintiffs submitted reports from the Rocky Mountain Poison Control Center, which document callers who have complained of symptoms after using Carlon Cement and other products. These reports tend to show that the chemicals in Carlon Cement are respiratory irritants, but do not document a connection between Carlon Cement and RADS.

would have evaporated at a much faster rate in the high temperatures of July 12th and 13th than at room temperature, and would have produced a "puff concentration" or "burst level" of vapors as Troy Mattis opened the cement can on those days. The Affidavit also asserts that Troy Mattis's "semi-obese condition"—he was 5' 10" and 280 pounds at the time of exposure—and work in high temperatures on July 12th and 13th would have caused him to inhale more air and hence more fumes than the average man. According to his Affidavit, Mr. Wabeke's analysis is based on the Brooks article and other clinical studies. None of the studies attached to the Affidavit document a case in which RADS was caused by one of the four solvents in Carlon Cement.

Mr. Wabeke also conducted an experiment to predict "the most probable ranges of workers' inhalation exposures to PVC cement organic solvent vapors." This procedure for the experiment was as follows:

1. A one-quart can of Carlon Cement was heated to 112 degrees Fahrenheit with the lid closed, and then transferred to a one-cubic foot air sampling chamber.

2. The Carlon Cement can was opened and its contents used to cement two pieces of PVC conduit, in accordance with the instructions on the can.

3. The can lid was closed, and the pieces of conduit were held together for thirty seconds.

4. The lid to the box was closed, and samples taken of the air of the box for one of five periods of time (30 seconds, one minute, three minutes, six minutes, or nine minutes).

5. The air in the sampling chamber was cleared, and the experiment repeated with a different length of air-sampling time.

Once the concentrations of solvent vapors were measured in parts per million, they were compared to the recommended exposure limits (REL's) recognized by the National Institute for Occupational Safety and Health (NIOSH). With the exception of methyl ethyl ketone, each of the solvents was measured in quantities exceeding its REL for each air-sampling time.

In opposition to Plaintiffs' experts, Defendants have retained Dr. Robert Kapp, a toxicologist with a Ph.D. in genetics. During his deposition, Dr. Kapp testified that his review of medical literature did not document any assertion that exposure to the particular solvents in Carlon Cement could cause Troy Mattis's reactive airways disease. A separate review of toxicological literature conducted on Defendants' behalf also revealed that the most pertinent studies found no causal relationship between the development of RADS and exposure to the Carlon Cement solvents. However, Dr. Kapp also testified that although the Brooks article is still controversial, it appears "more and more" in the literature, and that he agrees with the clinical methodology described in it. Elsewhere in his deposition, Dr. Kapp admitted that acetone, cyclohexanone, methyl ethyl ketone and tetrahydrofuran are all respiratory irritants (Kapp Dep. at 20), and that in high enough doses, they would be able to cause RADS (id. at 20, 72–73). Dr. Kapp nevertheless opined that these solvents did not cause RADS in Mattis's case, because they were not present in high enough quantities and because Mattis's symptoms occurred too long after his exposure.

Defendants provide some warnings with Carlon Cement, both on the can itself and on the Material Safety Data Sheet (MSDS) which is supplied with each box of cans. The label on the can includes, among others, the following warnings:

Store in a cool, dry, well-ventilated place. Vapors may ignite explosively. Prevent build-up of vapors—open all windows and doors—use only with cross ventilation. . . . Close container after use. . . . If inhaled, get fresh air. If ill feelings persist, seek medical attention.

At his deposition, Mattis testified that he read the label "[a] couple times" and that he remembered some, but not all, of the warnings. Mr. Wabeke has opined that

the warning label and MSDS were defective in several ways, and that improvements in them would ideally have led Mattis to change his behavior and avoid his exposure to Carlon Cement fumes. Dr. Kapp disputes these conclusions.

Plaintiffs' Amended Complaint contains four counts against Defendants: (1) Negligence; (2) Strict Liability; (3) Breach of Implied Warranty of Merchantability; and (4) Loss of Consortium. Based on these theories, Plaintiffs seek to recover at least $11,800 in medical expenses and at least $13,680 in lost earnings, in addition to damages for pain and suffering, disability, loss of enjoyment of life, and loss of consortium. Defendants now move for summary judgment.

## DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir.2000). To oppose summary judgment successfully, Plaintiffs "must show that admissible evidence will be available at trial to establish a genuine issue of material fact." *Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir.1995). In support of their Motion for Summary Judgment, Defendants argue that the proposed testimony of Dr. Hansen and Roger Wabeke is inadmissible and will thus be unavailable to show causation at trial. Plaintiffs do not point to any other evidence in support of their theory that Carlon Cement caused their injuries, but simply argue that the opinions of Dr. Hansen and Mr. Wabeke will be admissible at trial.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.[4] Before admitting scientific testimony under this Rule, a district court must find that "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). Under this standard, in determining whether a theory or technique is scientific knowledge, courts should consider:

> (1) whether the theory or technique can or has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error of the technique; and (4) general acceptance among the scientific community.

*United States v. Davis*, 103 F.3d 660, 673 (8th Cir.1996) (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97). The Supreme Court has emphasized that this inquiry is "a flexible one," whose "overarching subject is the scientific validity—and thus the evidentiary relevance—of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594–95, 113 S.Ct. at 2797.

The opinions of Dr. Hansen and Mr. Wabeke, and indeed the theory of RADS itself, are based upon a technique called differential diagnosis. "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999); *see also Stedman's Medical Dictionary* 474 (26th ed.1995). Dr. Hansen blames Mattis's difficulty breathing on the fumes from Carlon Cement by a process of elimination, ruling out other potential causes because Mattis had no history of respiratory complaints prior to his use of the Carlon Ce-

4. Rule 702 provides:
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

ment, and ruling in the Carlon Cement because his symptoms occurred soon after his exposure to the product. The Brooks article used this same technique with regard to the ten individuals it studied. Relying upon the Brooks article, Mr. Wabeke reaches the same conclusion with respect to Mattis as Dr. Hansen did.[5]

The Eighth Circuit has indicated that district courts enjoy a great deal of discretion when evaluating the reliability of differential diagnoses. The only Eighth Circuit case on this issue involved a 21 year old plaintiff who allegedly contracted laryngeal cancer from aerosolized milk particles contaminated with aflatoxin M–1 (AFM), a potent carcinogen. *See National Bank of Commerce v. Associated Milk Producers, Inc.*, 191 F.3d 858, 859 (8th Cir.1999). In excluding an expert opinion in support of the plaintiff's theory of causation, the district had refused to rely on the expert's differential diagnosis. *See id.* at 861. Reviewing the district court's decision to exclude expert testimony, the Eighth Circuit held that the district court had accorded too little weight to the differential diagnosis, given the fact the plaintiff was 21 years old at the time of his exposure, laryngeal cancer is very rare among individuals of that age, and plaintiff neither smoked nor drank. *See id.* at 863. Nevertheless, noting the absence of scientific studies demonstrating a correlation between AFM and laryngeal cancer, the Eighth Circuit affirmed that the district court's exclusion of the expert opinion was not an abuse of discretion. *See id.* at 864.

Differential diagnoses have generally been accepted as reliable by federal courts. The Fourth Circuit has recognized that the technique of differential diagnosis "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." *Westberry*, 178 F.3d at 262 (citing cases). Other federal courts of appeal agree, and have recognized that reliable differential diagnoses are "scientific knowledge" under *Daubert*. For example, in *Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir.1998), the Ninth Circuit reversed the district court's decision to exclude an expert opinion that plaintiff's lupus was caused by collagen, where the opinion was based on scientific and clinical studies of the connection of collagen and autoimmune disorders as well as a differential diagnosis of the plaintiff. *See Kennedy*, 161 F.3d at 1228–30. Similarly, in *Zuchowicz v. United States*, 140 F.3d 381 (2d Cir.1998), the Second Circuit upheld a district court's decision to admit an expert opinion linking plaintiff's primary pulmonary hypertension (PPH) to an overdose of danocrine, where the expert conducted a differential diagnosis and noted the similarity between plaintiff's case and accepted instances of drug-induced PPH. *See Zuchowicz*, 140 F.3d at 385–87. Other federal courts have reached similar decisions. *See, e.g., Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 154–55 (3d Cir.1999); *Baker v. Dalkon Shield Claimants. Trust*, 156 F.3d 248, 252–53 (1st Cir.1998); *Ambrosini v. Labarraque*, 101 F.3d 129, 140–41 (D.C.Cir. 1996).

Differential diagnoses of RADS, however, have not fared so well in the federal courts.[6] In *Moore v. Ashland Chemical Inc.*, 151 F.3d 269 (5th Cir.1998) (en banc), the Fifth Circuit upheld a district court's decision to exclude an expert opinion that

---

5. Defendants have moved to strike Mr. Wabeke's Affidavit and air-sampling study, because they were filed after the deadline for disclosure of expert opinions. Because Defendants have not pointed to any prejudice as a result of the late disclosure, the Motion to Strike is denied.

6. At the *Daubert* hearing, Plaintiffs cited *Minner v. American Mortgage & Guaranty Co.*, 2000 WL 703607 (Del.Super. April 17, 2000),

a Delaware trial-court decision holding that expert testimony about air quality in a "sick building" causing RADS was admissible "[b]y a bare minimum." *Minner*, 2000 WL 703607 at * 22. Because the Court is unfamiliar with the Delaware state courts' standards for the admission of scientific evidence, and because *Minner* is not a federal case or even a state appellate case, the Court does not rely on its decision.

a plaintiff's exposure to toluene caused him to suffer from RADS. In reaching the decision, the court noted that the conclusions reached in the Brooks article are admittedly speculative, and that the plaintiffs' expert had "made no attempt to explain his conclusion by asserting that the toluene solution had properties similar to another chemical exposure to which RADS had been scientifically linked." *Id.*, 151 F.3d at 278–79. Similarly, in *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119 (N.D.Ill.1995), a federal district court excluded expert testimony that atrazine and tebuthurion caused RADS in a plaintiff, where neither expert cited any studies published in the scientific or medical literature that linked these particular chemicals to RADS or any other respiratory or pulmonary conditions. *See id.* at 1122–23. Both of these courts emphasized that an opinion based solely on the temporal relationship between exposure and the onset of symptoms, is not generally enough to qualify as scientifically valid under *Daubert. See Moore*, 151 F.3d at 278 (noting that an exception has been recognized for compelling circumstances, such as where a plaintiff is doused with a dangerous chemical or where many people are exposed to the same chemical and develop similar symptoms); *Schmaltz*, 878 F.Supp. at 1122.

There are potential pitfalls in using analogical reasoning to link a disease which is generally thought to be caused by one chemical to another chemical which has not been shown to cause the disease. In *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Supreme Court wrote:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great of an analytical gap between the data and the opinion offered.

In *Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir.1999), the Tenth Circuit applied this principle to expert opinions purporting to show that certain chemicals had caused a plaintiff's leukemia. Based on published studies suggesting a link between benzene—a chemical to which the plaintiff had not been exposed—and some types of leukemia, plaintiffs' experts proposed to establish a link between leukemia and the chemical to which the plaintiff was actually exposed based on the similarities between these chemicals and benzene. *Mitchell*, 165 F.3d at 782. The Tenth Circuit affirmed the district court's rejection of this methodology, because there had been no explanation of "exactly what these similarities [were] and how the similarities cause the human body to respond to Defendant's chemicals in a matter similar to benzene." *Id.* In the absence of such a showing, the court wrote, "the analytical gap in the experts' testimony [was] simply too wide for the opinions to establish causation." *Id.*

There are similar weaknesses in the expert opinions linking Troy Mattis's symptoms to RADS. Plaintiffs have not produced any documented case in which any of the four solvents at issue—acetone, cyclohexanone, methyl ethyl ketone or tetrahydrofuran—caused RADS. To compensate for this deficiency, Mr. Wabeke suggests that these solvents can cause RADS because, like the etiological agents identified in the Brooks article, they are all respiratory irritants. The Brooks article, however, does not establish that irritant properties are crucial to the development of RADS. While the article hypothesizes that the development of RADS is connected to "the toxic effects of the irritant exposure on the airways," it specifically states that this conclusion "is only speculative and not substantiated." As long as the causal connection between respiratory irritants remains an unproven hypothesis, there remains an "analytical gap" between the clinical studies on RADS and the particular solvents at issue in this case. *See Mitchell*, 165 F.3d at 782; *Moore*, 151 F.3d at 278–79.

That gap, however, is not fatal to the opinions of Plaintiffs' experts. The Eighth Circuit's decision in *National Bank of Commerce, supra,* involved expert opinions with similar methodological weaknesses. *See National Bank of Commerce,* 191 F.3d at 864. Nevertheless, the Eighth Circuit in that case held that the district court gave too little weight to a differential diagnosis, and indicated that the district court could have exercised its discretion to admit the expert opinion. *See id.* at 863–64. Similarly, *Bednar v. Bassett Furniture Mfg. Co.,* 147 F.3d 737 (8th Cir.1998) involved evidence that formaldehyde was dangerous generally, but no evidence that it caused some of the particular symptoms suffered by the plaintiffs' baby. *See Bednar,* 147 F.3d at 739. In that case, the Eighth Circuit reversed the district court's exclusion of the evidence, finding that the plaintiffs had presented enough evidence to show causation. *See id.* at 740. The Brooks article has been subject to peer review, and appears to be generally accepted in the relevant scientific and medical communities. Finally, the gap between clinical cases of RADS and Carlon Cement is to some extent bridged by the testimony of Defendants' own expert, who stated that he agrees both with the methodology in the Brooks article and with the conclusion that Carlon Cement solvents can cause RADS if they are present in high enough concentrations.[7] *See Heller,* 167 F.3d at 160–61 (noting that methodology of plaintiff's expert appeared to satisfy *Daubert,* where, among other things, defendant's expert agreed with the methodology). Under these circumstances, the Court finds that the opinions of Plaintiffs' experts are "scientific knowledge" under *Daubert.*

Under *Daubert,* even scientific knowledge is inadmissible unless it "properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796. "That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *Porter v. Whitehall Laborato-*

*ries,* 9 F.3d at 616. In order to satisfy this requirement, "a plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance." *Wright v. Willamette Industries, Inc.,* 91 F.3d 1105, 1106 (8th Cir.1996) (expert testimony was inadmissible in the absence of such evidence). Plaintiffs need not produce "a mathematically precise table equating levels of exposure with levels of harm," but there must be "some evidence from which a reasonable person could conclude" that fumes from Carlon Cement caused Mattis's injuries. *Id.* at 1107.

Plaintiffs have produced such evidence. Mr. Wabeke concludes that Mattis "had an excessive acute exposure" to the Carlon Cement solvents, based in part, on the air-sampling study attached to his Affidavit. "It is well established that in order to introduce evidence of experimental tests, one must first show that the tests were conducted under conditions substantially similar to the actual conditions." *Bunting v. Sea Ray, Inc.,* 99 F.3d 887, 892 (8th Cir.1996) (internal quotation marks and citation omitted). Although there is something of a "gap" between the conditions of the experiment and the conditions under which Troy Mattis was working, the air sampling study is similar enough to those conditions to be admissible at trial. *See Bednar,* 147 F.3d 737, 740 (8th Cir.1998) (expert opinion that baby's health problems were caused by formaldehyde emanating from dresser was admissible, based on experiment finding dangerous levels of formaldehyde gas inside the dresser drawers, and testimony that the gas would have left the drawers and concentrated in the air of the baby's room); *see also McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042–43 (2d Cir.1995) (consulting engineer's practical experience rendered him qualified to testify about air-dispersal pat-

---

**7.** Dr. Kapp's opinion that Mattis's symptoms did not occur soon enough after his exposure to Carlon Cement creates an issue of fact for the jury to decide.

terns in toxic tort case). The level of Mattis's exposure to the Carlon Cement solvents is an issue of fact for the jury to decide.

With the opinion evidence of Dr. Hansen and Mr. Wabeke, Plaintiffs have enough evidence to withstand summary judgment. These experts' opinions that the fumes from Carlon Cement are responsible for Troy Mattis's breathing problems are enough to support a finding for Plaintiffs on the issue of causation. *See Brookings Municipal Utilities, Inc. v. Amoco Chem. Co.*, 103 F.Supp.2d 1169, 1179–80 (D.S.D. 2000) (discussing causation generally). Mr. Wabeke also has sufficient expertise to render an opinion about the adequacy of Carlon Cement's warning label and MSDS. There are thus genuine issues of material fact as to whether Carlon Cement caused Plaintiffs' injuries and whether Defendants' warnings were adequate. Any weaknesses in the opinions of Plaintiffs' experts are of course subject to cross-examination and rebuttal at trial. *See McCullock*, 61 F.3d at 1044.

## CONCLUSION

The Court finds that the opinions of Plaintiffs' experts qualify as "scientific knowledge" under *Daubert*, and that there is sufficient evidence of Troy Mattis's level of exposure to the Carlon Cement solvents. With Plaintiffs' expert opinions, there is enough evidence to create an issue of fact on causation. Accordingly,

IT IS ORDERED:

(1) that the Motion to Strike the Affidavit and Study of Roger Wabeke (Docket No. 70) is denied;

(2) that the Motion to Exclude the Testimony of Dr. Lori Hansen and Roger Wabeke (Docket No. 50–1) is denied; and

(3) that the Motion for Summary Judgment (Docket No. 50–2) is denied.